FILED
CLERK, U.S. DISTRICT COURT

01/13/2022

CENTRAL DISTRICT OF CALIFORNIA
BY: D. Brown DEPUTY

JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>HECTOR MANUEL PERILLA UMBARILA,<br><br>A Fugitive from the Government of the Republic of Columbia. | Case No. EDCV 19-2383-CJC (KK)<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW; ORDER CERTIFYING EXTRADITABILITY |

The request of the United States of America for the issuance of an order certifying the extraditablity of Hector Manuel Perilla Umbarila, also known as Hector Manuel Perilla Umbarilla, Hector Perilla, or Steven Bernal ("Perilla Umbarila"), came on regularly for hearing before the Court on December 14, 2021. Upon consideration of the evidence, in particular the certified and authenticated documents submitted by the Government of the Republic of Colombia,[1] and the pleadings and the arguments of counsel, the Court makes the following findings of fact and conclusions of law.

///

---

[1] The Government of the Republic of Colombia submitted documents that were properly authenticated and certified in accordance with 18 U.S.C. § 3190. See dkts. 19, 43-2.

1

**I.**

2

**FINDINGS OF FACT**

3

**A.    MURDERS AND ROBBERY IN COLOMBIA**

4        On the evening of October 5, 2009, Maria Cristina Umbarila de Bernal, also

5   known as, "Maria Cristina Umbarilla de Bernal" ("Umbarila-Bernal"), was murdered

6   in her apartment along with the building's security guard, Audon Martinez-Mendez

7   ("Martinez-Mendez").  See ECF Docket No. ("Dkt.") 19-5 at 25, 35.  Umbarila-

8   Bernal had been hit in the head and stabbed in the neck, and a sock had been put in

9   her mouth to prevent her from screaming.  See id. at 35.  Martinez-Mendez had been

10  stabbed nine times in his neck, back, and upper extremities, and there were defense

11  wounds on his hands and forearms.  See id.  Umbarila-Bernal's bedroom, where she

12  had been killed, was in disarray.  See id. at 35-36.  Police discovered a smashed

13  piggybank[2], emptied jewelry boxes, and an open wallet (or handbag).  See id. at 25, 36.

14  A nightstand drawer and closet appeared to have been rifled through.  See id. at 36.

15  However, there was no sign of a forced entry to Umbarila-Bernal's apartment.  See id.

16       Colombian authorities began focusing on Perilla Umbarila, Umbarila-Bernal's

17  nephew, as the perpetrator of these crimes.  See id. at 37.  The investigation revealed

18  that after returning from the United States to Colombia to start a business, Perilla

19  Umbarila lived with Umbarila-Bernal for approximately one year.  See id. at 36-37, 43.

20  At the time of the murders, Perilla Umbarila was living with his girlfriend.  See id. at

21  36.

22       Perilla Umbarila's business in Colombia was not successful.  See id. at 43.

23  Therefore, he asked Umbarila-Bernal and other family members to lend him money.

24  See id.  Umbarila-Bernal, however, declined to financially support her nephew and

25  advised him to move back to the United States, where he had a wife and children.  See

26  id.  According to one of Umbarila-Bernal's daughters, her mother felt unsafe after

27

28  [2]    Umbarila-Bernal saved COP (Colombian peso) 500 coins in her piggybank.
    See dkt. 19-5 at 36.

1   telling Perilla Umbarila that she would not financially support him.  See id. at 16, 18.
2   Umbarila-Bernal decided to change the locks to prevent Perilla Umbarila from
3   entering her apartment uninvited.  See id.

4        Another one of Umbarila-Bernal's daughters, said that a week prior to the
5   murders, Perilla Umbarila called his aunt and asked for a loan of money.  See id. at 19.
6   When Umbarila-Bernal refused to give him the loan, Perilla Umbarila reacted
7   aggressively towards her.  See id.

8        On the day of the murders, at approximately 3:00 p.m., Perilla Umbarila went
9   to his aunt's apartment.  See id. at 19, 36.  One of Umbarila-Bernal's neighbors said
10  she saw Perilla Umbarila enter the apartment building around 3:00 p.m.  See id. at 15,
11  36.  Perilla Umbarila admitted that he went to his aunt's apartment around 3:00 p.m.
12  on the afternoon of the murders, but claimed he went there to help her recover from
13  dental surgery.  See id. at 17, 19.

14       At approximately 5:00 p.m., Umbarila-Bernal and one of her daughters spoke
15  by telephone for approximately five minutes.  See id. at 27, 36, 39.  During this call,
16  Umbarila-Bernal told her daughter that Perilla Umbarila was still at her apartment.
17  See id. at 36, 39.  Perilla Umbarila claimed he left the apartment around 5:00 p.m. or
18  5:30 p.m.  See id. at 19.

19       Between approximately 5:30 p.m. and 5:35 p.m., a neighbor on the third floor
20  of the apartment building heard shouts and noises coming from the second floor,
21  where Umbarila-Bernal's apartment was located.  See id. at 12, 27.

22       Between approximately 6:00 p.m. and 6:30 p.m., Perilla Umbarila returned
23  home, where his girlfriend and another friend were present.  See id. at 13, 17.  Perilla
24  Umbarila's girlfriend noticed he was wearing different clothes from the ones he had
25  worn when he left their home that morning and was carrying a blue suitcase.  See id.
26  at 13, 36-37.  When she asked him about the change of clothes, Perilla Umbarila told
27  her that his original clothes were greasy from the machinery work he had performed
28  earlier in the day, and therefore, he had changed at his aunt's apartment and left his

1   other clothes for his aunt to wash.  See id. at 13, 19, 22, 37.  Because Perilla

2   Umbarila's girlfriend washed his clothes daily, she was not satisfied with his

3   explanation.  See id. at 13.  Law enforcement authorities were unable to locate the

4   clothing that Perilla Umbarila claimed to have left at his aunt's home.  See id. at 41.

5          Between approximately 7:30 p.m. and 8:00 p.m., Martinez-Mendez's wife came

6   to the apartment building where her husband worked as a security guard and noticed

7   that he was not at his post.  See id. at 19, 38.  When a neighbor reported seeing Perilla

8   Umbarila at the apartment building that day, Martinez-Mendez's wife grew concerned

9   because she knew Perilla Umbarila and her husband had argued before.  See id. at 38.

10  Using one of her husband's keys, she opened up Umbarila-Bernal's apartment and

11  discovered Martinez-Mendez's body.  See id. at 19, 38.

12         At approximately 9:05 p.m., a police officer, who had been called, went to

13  Umbarila-Bernal's apartment and found Martinez-Mendez dead in the passageway.

14  See id. at 12.  The police officer also found Umbarila-Bernal dead in her bedroom,

15  "curled up, with a white rag in her mouth, and a lot of blood."  See id.  In the

16  bedroom, the police officer noticed a shattered piggybank and a wallet (or handbag)

17  on the bed.  See id.

18         Later that evening, Perilla Umbarila received a telephone call from his sister,

19  who told him about what had happened at his aunt's home.  See id. at 19.  After that

20  telephone call, between approximately 10:30 p.m. and 11:00 p.m., Perilla Umbarila left

21  their house.  See id. at 17, 19-20.

22         Shortly after Perilla Umbarila left their house, his girlfriend received a

23  telephone call from Perilla Umbarila's co-worker, who said that Perilla Umbarila had

24  killed Umbarila-Bernal and the security guard.  See id. at 13.  The co-worker asked

25  Perilla Umbarila's girlfriend to see if Perilla Umbarila "was wearing clothing with

26  blood on it or anything."  See id. at 17.  When Perilla Umbarila's girlfriend looked

27

28

1   inside the blue suitcase that he brought home, she discovered items, including "some
2   creams," "a spray," mobile telephones, and women's jewelry.[3]  See id. at 36.

3   　　　　When Perilla Umbarila returned home at approximately 5:00 a.m. the next
4   morning, he told his girlfriend he had been falsely accused.  See id. at 17.  Perilla
5   Umbarila said he had gone to his aunt's home to help her after her dental surgery and
6   had left there without incident.  See id. at 17, 19.  According to Perilla Umbarila, it
7   was not unusual for him to have changed clothes at his aunt's home and he kept spare
8   clothes there because his work required him to operate heavy machinery.  See id. at
9   19.  With regard to the items in the blue suitcase, Perilla Umbarila claimed he had
10  bought them at a good price with the intention to resell them for a profit.  See id. at
11  17, 37.

12  　　　　Perilla Umbarila maintained he was not at Umbarila-Bernal's home at the time
13  of the murders.  See id. at 19.  However, in contrast to his earlier explanation to his
14  girlfriend, Perilla Umbarila said that he had been given the items in the suitcase by his
15  aunt, who wanted him to sell the items so that he could afford to return to the United
16  States.  See id. at 13, 17-18.  One of Umbarila-Bernal's daughters contradicted this and
17  said the "creams and sprays" actually belonged to her and were due to be delivered to
18  someone else who had asked for them.  See id. at 42.  In addition, the mobile
19  telephone, which Perilla Umbarila claimed was also given to him by Umbarila-Bernal,
20  was actually activated in the United States, and Umbarila-Bernal intended to use it
21  there on an upcoming trip.  See id.

22  **B.    PROSECUTION OF PERILLA UMBARILA IN COLOMBIA**

23  　　　　Following Perilla Umbarila's arrest, he was tried in Colombia for the crimes of
24  Aggravated Homicide, Homicide, and Robbery.  See id. at 9-24.  On September 27,
25  2010, the Second Circuit Criminal Court, Trials, in Bogotá, Colombia, acquitted

26

27  _____

28  [3]    According to Umbarila-Bernal's daughters, these items belonged to their
      mother.  See dkt. 19-5 at 13.  Perilla Umbarila's girlfriend also found "100 COP500
      coins."  See id.

5

1   Perilla Umbarila of these crimes.  See id.  The prosecutor appealed the acquittal.  See

2   id. at 25.

3        Perilla Umbarila did not participate in the appellate proceedings despite his

4   obligation to do so.  See id. at 29-30, 51.  On March 29, 2011, the Superior Tribunal

5   of the Judicial District of Bogota, Criminal Bench (the "Superior Tribunal") vacated

6   the lower court's verdict and found Perilla Umbarila guilty of Aggravated Homicide,

7   Homicide, and Robbery with Violence, in violation of Articles 103, 104.2, 239, 240.1,

8   and 240.2 of the Colombian Criminal Code.  See id. at 25-49.  That same day, Justice

9   Dagoberto Hernandez-Peña of the Superior Tribunal issued warrants for Perilla

10  Umbarila's arrest.  See dkt. 19-3 at 79-83.

11       On April 4, 2011, the Superior Tribunal read its judgment and sentenced Perilla

12  Umbarila to a term of imprisonment of 600 months.  See dkt. 19-5 at 52.  The

13  Superior Tribunal published its decision the following day.  See id. at 25-49.

14  **C.   COLUMBIA SEEKS PERILLA UMBARILA'S EXTRADITION**

15       Colombia submitted a request to the United States for Perilla Umbarila's

16  extradition so that he can serve his 600-month prison sentence for Aggravated

17  Homicide, Homicide, and Robbery with Violence, in violation of Articles 103, 104.2,

18  239, 240.1, and 240.2 of the Colombian Criminal Code.  See dkts. 1, 14, 19.  In

19  accordance with its obligations under the Extradition Treaty with the Republic of

20  Colombia, U.S.-Colom., Sept. 14, 1979, S. Treaty Doc. No. 97-8 (1981) (the "Treaty"),

21  on October 4, 2019, the United States filed an extradition complaint in this District

22  and obtained an arrest warrant issued by the Honorable Steve Kim, United States

23  Magistrate Judge for the Central District of California.  See dkt. 2.

24       On October 7, 2019, the United States Marshals Service arrested Perilla

25  Umbarila.  See dkt. 6.  At Perilla Umbarila's initial court appearance on October 8,

26  2019, the Unites States moved for detention.  See dkts. 7, 8.  The Court found no

27  special circumstances existed warranting Perilla Umbarila's release and ordered his

28  continued detention.  See dkt. 7, 9.

1       On December 14, 2021, the Court held a hearing to consider the evidence of

2   criminality presented by Colombia and to determine whether it is "sufficient to sustain

3   the charge under the provisions of the proper treaty or convention."  See dkt. 47; 18

4   U.S.C. § 3184.  Following the extradition hearing, the Court took the matter under

5   advisement.

6                                          II.

7                              **CONCLUSIONS OF LAW**

8       Extradition is primarily an executive responsibility with a specially defined role

9   for a judicial officer.  See Prasoprat v. Benov, 421 F.3d 1009, 1014 (9th Cir. 2005).

10  The Court is authorized by statute to determine whether to certify to the Secretary of

11  State that the evidence submitted by the country requesting extradition is "sufficient

12  to sustain the charge."  18 U.S.C. § 3184.  If the Court so certifies, the Secretary of

13  State then decides whether the fugitive should be surrendered to the requesting

14  country.  See 18 U.S.C. §§ 3184, 3186; Santos v. Thomas, 830 F.3d 987, 991 (9th Cir.

15  2016) (en banc); Prasoprat, 421 F.3d at 1012.

16      To certify Perilla Umbarila's extradition for the Secretary of State's decision on

17  his surrender, the Court must find: (1) the Court has jurisdiction to conduct

18  extradition proceedings; (2) the Court has jurisdiction over the fugitive; (3) an

19  extradition treaty is in force and effect; (4) the fugitive is being sought for offenses for

20  which the applicable treaty permits extradition; and (5) there is sufficient evidence to

21  establish probable cause that the individual appearing in court is the fugitive who

22  committed the offense for which extradition is requested.  See Santos, 830 F.3d at

23  991; Manta v. Chertoff, 518 F.3d 1134, 1140 (9th Cir. 2008); Quinn v. Robinson, 783

24  F.2d 776, 783, 790 (9th Cir. 1986); Zanazanian v. United States, 729 F.2d 624, 625-26

25  (9th Cir. 1984).  A magistrate judge "has no discretionary decision to make."  See

26  Prasoprat, 421 F.3d at 1012.  If the elements of extradition are present, the magistrate

27  judge must certify extradition.  Id.

28

1    In the instant case, Perilla Umbarila contests only two of the requisite criteria:

2    (1) whether an extradition treaty is in force and effect and (2) whether there is

3    sufficient evidence to establish probable cause.  Tr. of Extradition Hearing, dated

4    12/14/2021 ("Tr.") at 6:3-18.  For the reasons set forth below, the Court finds both

5    claims are without merit.  After reviewing the pleadings and arguments made by the

6    parties at the December 14, 2021 extradition hearing, and as detailed below, this

7    Court finds all five certification criteria are satisfied in this case.

8    **A.    SUBJECT MATTER JURISDICTION**

9    The Court has subject matter jurisdiction to conduct extradition proceedings

10   pursuant to 18 U.S.C. § 3184 and General Order 05-07 of United States District Court

11   for the Central District of California.  Perilla Umbarila does not dispute this fact.

12   **B.    PERSONAL JURISDICTION**

13   This Court has jurisdiction over a fugitive found within its jurisdictional

14   boundaries.  18 U.S.C. § 3184 (stating a court "may, upon complaint made under oath,

15   charging any person found within [its] jurisdiction, . . . issue [its] warrant for the

16   apprehension of the person so charged").  The United States Marshals Service

17   arrested Perilla Umbarila in Los Angeles, California on October 7, 2019.  Dkt. 6; see

18   also In re Extradition of Mainero, 990 F. Supp. 1208, 1216 (S.D. Cal. 1997) (holding

19   the court has jurisdiction over the respondents if they are before the court).  Hence,

20   because Perilla Umbarila was "found within [this] jurisdiction," the personal

21   jurisdictional requirement of 18 U.S.C. § 3184 is met.  Perilla Umbarila does not

22   dispute this fact.

23   **C.    PERILLA UMBARILA IS SOUGHT FOR OFFENSES COVERED BY**

24   **        THE TREATY**

25   Perilla Umbarila was convicted in Colombia, and the United States has sought

26   certification for Perilla Umbarila's extradition on the following charges: Aggravated

27   Homicide, Homicide, and Robbery with Violence, in violation of Articles 103, 104.2,

28   239, 240.1, and 240.2 of the Colombian Criminal Code, for which Perilla Umbarila

was sentenced to a term of imprisonment of 600 months.  Article 2(1) of the Treaty defines extraditable offenses as follows:

> (a) Offenses described in the Appendix to this Treaty which are punishable under the laws of both Contracting Parties; or
>
> (b) Offenses, whether listed in the Appendix to this Treaty or not, provided they are punishable under the Federal laws of the United States and the laws of the Republic of Colombia.

Dkt. 19-1, Declaration of Tom Heinemann ("Heinemann Decl.") attaching Treaty at 8-22; Treaty, art. II.  In the instant case, Aggravated Homicide, Homicide, and Robbery with Violence, all appear in various forms in the Treaty's Appendix.  See Treaty Appendix.  Further, Perilla Umbarila's criminal activity in Colombia, had it occurred in the United States, would be subject to prosecution under both federal and state law.  See 18 U.S.C. §§ 1111 (Murder), 2111 (Robbery); Cal. Penal Code §§ 187-89 (Homicide), 211-13 (Robbery); United States v. Khan, 993 F.2d 1368, 1372 (9th Cir. 1993) ("Many cases have held that dual criminality is satisfied even though the names of the crimes and the required elements were different in the two countries.").  Therefore, all of the foregoing offenses qualify as extraditable offenses under Article 2 of the Treaty.  See Heineman Decl., ¶¶ 2, 5; Treaty, art. II.  Perilla Umbarila does not dispute this fact.

**D.   THE TREATY BETWEEN THE UNITED STATES AND COLUMBIA IS VALID AND IN FORCE**

The United States and Colombia have had a valid extradition treaty in force since 1888.  See In re Extradition of Maurcio Pardo Hasche, No. 01-Misc.Cr.-49-A, 1:01-mj-3082-HBS, Decision & Order, at 2 (W.D.N.Y. Aug. 30, 2002) ("Pardo Hasche").  On September 14, 1979, the United States and Colombia signed a new treaty (the Treaty) to address the international drug trade.  See id.  Colombia ratified

the Treaty on November 3, 1980.[4]  See dkt. 43-2, Declaration of Tom Heinemann, dated 06/15/2020 ("Suppl. Heinemann Decl."), ¶ 3.  The United States ratified the Treaty on January 4, 1982.  See id.  When the parties exchanged instruments of ratification on March 4, 1982, the Treaty entered into force pursuant to Article 21 therein.  See id., ¶¶ 3-4.

In 1986 and 1987, the Colombian Supreme Court "ruled invalid the relevant Colombian legislation approving or giving domestic effect to the Treaty."  Id., ¶ 6.  However, the impact of those decisions is purely internal to Colombia.  See Pardo Hasche at 5.  As the State Department has articulated:

> Whatever the effect those decisions may have had under the internal law of Colombia, the United States has never considered the Colombian court's decisions had the effect of terminating or suspending operation of the Treaty, either as a matter of international law generally or under the express terms of Article 21.[5]

Suppl. Heinneman Decl., ¶ 6.

Although the Colombian court decisions only affected extraditions from Colombia to the United States, Perilla Umbarila claims the decisions impact extraditions from the United States to Columbia, and that the Treaty is therefore invalid.  However, under binding Supreme Court precedent, Perilla Umbarila presents a non-justiciable political question solely within the executive branch's purview.  Hence, his claim fails.

In Doe ex dem. Clark v. Braden, the Supreme Court held that whether the King of Spain had authority to ratify a treaty ceding Florida to the United States was a

---

[4]    Colombia ratified the Treaty by passing legislation, which a government minister, to whom Colombia's President had delegated functions while he was abroad, signed.  See United States v. Gallo-Chamorro, 48 F.3d 502, 503 n.1 (11th Cir. 1995); United States v. Martinez, 755 F. Supp. 1031, 1032-33 (N.D. Ga. 1991); Pardo-Hasche, at 2.

[5]    Article 21(4) provides that the Treaty may be terminated when one party gives notice of termination to the other.

1  "political question[], not judicial," that "belong[s] exclusively to the political

2  department of the government."  57 U.S. 635, 657 (1853).  Accordingly, the Supreme

3  Court refused to consider the defendant's challenge to the validity of the treaty

4  ratification, noting that "the courts of justice have no right to annul or disregard any

5  of [the treaty's] provisions, unless they violate the Constitution of the United States."

6  Id.; see also Terlinden v. Ames, 184 U.S. 270, 288-89 (1902) (relying on Braden to

7  uphold U.S.-Prussia extradition treaty).  This understanding comports with the

8  Supreme Court's later explanation that:

9        A treaty is primarily a compact between independent nations, and

10       depends for the enforcement of its provisions on the honor and the

11       interests of the governments which are parties to it.  If these fail, its

12       infraction becomes the subject of international reclamation and

13       negotiation, which may lead to war to enforce them.  With this judicial

14       tribunals have nothing to do.

15  Charlton v. Kelly, 229 U.S. 447, 474 (1913) (citation and internal quotation marks

16  omitted; emphasis added).  "[W]hile federal courts are necessarily called upon to

17  interpret treaties, they must observe the line between treaty interpretation on the one

18  hand and negotiation, proposal and advice and consent and ratification on the other."

19  Franklin Mint Corp. v. Trans World Airlines, Inc., 690 F.2d 303, 311 (2d Cir. 1982)

20  (citation omitted).

21       As a result, "courts have generally exercised great restraint in dealing with

22  matters involving our relations with foreign nations, deferring instead to the

23  Executive Branch."  United States v. Williams, 617 F.2d 1063, 1092 n.9 (5th Cir. 1980)

24  (en banc) (citations omitted) (Roney, J., Godbold, J., Hill, J. Fay, J. Tate, J., and Clark,

25  J., specially concurring); see also United States v. Fernandez-Pertierra, 523 F. Supp.

26  1135, 1141-42 (S.D. Fla. 1981) (A "long judicial tradition" supports a "general judicial

27  policy of deference to the executive in the area of foreign relations[.]" (citing Dames

28  & Moore v. Regan, 453 U.S. 654 (1981); Haig v. Agee, 453 U.S. 280 (1981)).  Such

1   deference arises out of the "generally accepted view" that "foreign policy [is] the

2   province and responsibility of the Executive," whose authority in foreign policy

3   derives from Article II of the U.S. Constitution. <u>Dep't of Navy v. Egan</u>, 484 U.S. 518,

4   529 (1988) (quoting <u>Haig</u>, 453 U.S. at 293-94). The authority of the Executive in the

5   field of foreign relations is "very delicate, plenary and exclusive." <u>Dames & Moore</u>,

6   453 U.S. at 661 (quoting <u>United States v. Curtiss-Wright Export Corp.</u>, 299 U.S. 304,

7   319-20 (1936)).

8        According to the Ninth Circuit, judicial deference concerning foreign relations

9   encompasses the State Department's determination that a treaty is in force. <u>See</u> <u>Then</u>

10  <u>v. Melendez</u>, 92 F.3d 851, 854 (9th Cir. 1996) ("The continuing validity of [a treaty]

11  presents a political question, and we must defer to the intentions of the State

12  Departments of the two countries." (citations omitted)); <u>In re Extradition of Camelo-</u>

13  <u>Grillo</u>, No. 16-cv-9026, 2017 WL 2945715, at *5 (C.D. Cal. July 10, 2017) (concluding

14  in another Colombian extradition case that "[t]he State Department's determination

15  of the continuing validity of a treaty is entitled to deference"); <u>In re Extradition of</u>

16  <u>Fletcher</u>, No. 16-00334 KJM, 2017 WL 1034199, *4 (D. Haw. Feb. 1, 2017) ("The

17  existence of a valid treaty of extradition between the United States and [another

18  nation] is a political question about which courts defer to the executive branch."

19  (citing <u>Then</u>, 92 F.3d at 854)); <u>see also</u> <u>Arias Leiva v. Warden</u>, 928 F.3d 1281, 1289

20  (11th Cir. 2019) ("[W]e are deferring to the Executive's judgment on a <u>political</u>

21  <u>issue</u>—that is, treaty recognition. (emphasis in original; citations omitted)).

22       Here, the State Department has explicitly stated the Treaty is "in full force and

23  effect." Heinemann Decl., ¶ 2; Suppl. Heinemann Decl., ¶ 5. As explained in the

24  declaration of Tom Heinemann, then-Assistant Legal Adviser at the State

25  Department, Article 21(2) of the Treaty provides for its entry into force when the

26  parties exchange instruments of ratification. <u>See</u> Suppl. Heinemann Decl., ¶¶ 1, 4.

27  Mr. Heinemann has further explained that under international law and practice, a

28  treaty that has entered into force remains in force, unless it is set aside on one of the

grounds and under the conditions provided for in international law. <u>See</u> <u>id.</u>, ¶ 7.  Mr. Heinemann has also confirmed that two Colombian Supreme Court decisions from more than thirty years ago do not constitute grounds for invalidating the Treaty under international law. <u>See</u> <u>id.</u>, ¶ 6.

According to Mr. Heinemann, Article 46 of the Vienna Convention on the Law of Treaties provides that a State may not invoke a violation of its internal law as invalidating its consent to be bound "unless that violation was manifest and concerned a rule of its internal law of fundamental importance." <u>See</u> <u>id.</u>, ¶ 7; <u>accord</u> Restatement (Third) of the Foreign Relations Law of the United States § 311, para. 3. A violation would be "manifest" only "if it would be objectively evident" to any State acting "in accordance with normal practice and in good faith." <u>See</u> Suppl. Heinemann Decl., ¶ 7.  Mr. Heinemann confirms that the circumstances relied upon in the Colombian Supreme Court's decisions do not meet this threshold. <u>See</u> <u>id.</u>, ¶ 6. Moreover, Articles 65 and 67 of the Convention provide that a State wishing to invalidate, terminate, or suspend a treaty on one of the grounds specified in the Convention must provide written notification to the other Party. <u>See</u> <u>id.</u>, ¶ 7; <u>accord</u> Restatement (Third) of the Foreign Relations Law of the United States § 337, para. 1 & cmt. (b).  Colombia has not provided such a notification to the United States. <u>See</u> Suppl. Heinemann Decl., ¶ 7.  To the contrary, Colombia has continued to express its view that the Treaty remains in force. <u>See</u> <u>id.</u>, ¶ 8.  In addition, the Treaty appears on a list that the State Department publishes of current treaties in force. <u>See</u> U.S. Dept. of State, <u>A List of Treaties and Other International Agreements of the United States in Force on January 1, 2019</u>, at 90.

Thus, the State Department's view that the Treaty remains in force "is entitled to great weight and importance." <u>Sayne v. Shipley</u>, 418 F.2d 679, 684 (5th Cir. 1969) (holding Article XVI of extradition treaty with Panama is in effect because "[t]he Assistant Legal Advisor [sic] for Treaty Affairs of the State Department has advised the District Court that Article XVI of the 1903 Treaty is still in effect"); <u>see also, e.g.,</u>

1   <u>Meza v. U.S. Attorney General</u>, 693 F.3d 1350, 1358 (11th Cir. 2012) (relying solely

2   on declaration of Attorney Adviser in State Department's Office of Legal Adviser

3   because "[w]e must defer to the determination of the executive branch that the

4   [extradition] treaty . . . remains in force").[6]

5           Courts that have considered the continuing validity of the U.S.-Colombia

6   extradition treaty and whether the Treaty remains in force have deferred to the

7   Executive Branch.  For example, in 2019, the Eleventh Circuit in <u>Arias Leiva v.</u>

8   <u>Warden</u> addressed the political question doctrine in a case involving the extradition of

9   a fugitive to Colombia.  928 F.3d at 1283.  In that case, the fugitive, like Perilla

10  Umbarila, claimed that even though the State Department stated that "both countries

11  continue to recognize the compact as valid and in force," the United States could not

12  extradite him to Colombia because the extradition treaty was not in effect due to the

13  Colombian Supreme Court's 1986 decision.  <u>Id.</u>  The Eleventh Circuit rejected the

14  fugitive's assertion and upheld the extradition by "deferring to the Executive's

15  judgment on a <u>political issue</u> – that is, treaty recognition."  <u>Id.</u> at 1289 (emphasis in

16  original).  The appellate court explained "'the question whether power remains in a

17  foreign State to carry out its treaty obligations is in its nature political and not judicial,

18  _____

19  [6]     Courts have deferred to the Executive Branch under the political question
     doctrine to uphold the validity of treaties between the United States and other
20   nations.  <u>See, e.g.</u>, <u>Then</u>, 92 F.3d at 854 (affirming denial of fugitive's habeas petition
     and recognizing that "continuing validity of [a treaty] is a political question . . . ."
21   (internal citation omitted)); <u>Kasterova v. United States</u>, 365 F.3d 980, 986 (11th Cir.
     2004) (same); <u>Marine v. Bush</u>, 53 F. App'x 123, 124 (D.C. Cir. 2002) (affirming
22   dismissal of claims because "[w]e could not grant relief on these claims without . . .
     finding that Panama did not properly ratify the treaty [in which the Panama Canal was
23   transferred to the Republic of Panama]—a political question beyond the competence
     of an Article III court"); <u>In re Extradition of Hilton</u>, No. 13-7043-JCB, 2013 WL
24   1891327, *4 (D. Mass. May 3, 2013) ("Questions regarding the continuing validity of
     an extradition treaty are considered political questions and courts must defer typically
25   to the intention of the State Departments of the two signatory countries." (citations
     omitted)); <u>In re Extradition of Bilanovic</u>, No. 1:08-mj-74, 2008 WL 5111846, *6
26   (W.D. Mich. 2008) ("Because extradition is essentially a political question, the position
     of the Executive Branch is entitled to considerable deference, if not dispositive
27   weight."); <u>United States v. Mitchell</u>, No. 83-CR-86, 1990 WL 132573, at *7 (E.D.
     Wisc. Sept. 10, 1990) (rejecting defendant's argument that U.S.-Colombia extradition
28   treaty was unenforceable, noting that "[i]t is not for the United States judiciary to
     assess the validity of actions taken by the government of Colombia . . . .").

1   and . . . the courts ought not . . . interfere with the conclusions of the political

2   department in that regard.'" Id. at 1287 (quoting Terlinden, 184 U.S. at 288).  The

3   Eleventh Circuit also distinguished its holding from previous decisions cited by the

4   fugitive: Gallo-Chamorro, 48 F.3d at 502; United States v. Duarte-Acero, 296 F.3d

5   1277 (11th Cir. 2002); and United States v. Valencia-Trujillo, 573 F.3d 1171 (11th Cir.

6   2009)).  See Arias Leiva, 928 F.3d at 1291-92.  The court observed that, in those cases:

7           We had no occasion to discuss the authority of the United States under

8           United States law, to invoke the Treaty when extraditing fugitives to

9           Colombia.  Accordingly, nothing in our prior opinions gives us reason to

10          doubt that authority here or otherwise binds us to a different outcome

11          than the one we reach today.

12  Id. at 1292 (emphasis in original).

13          In In re Extradition of Risner, a district court adopted the "Eleventh Circuit

14  panel's thorough reasoning," and held "that there is a valid, ratified extradition treaty

15  in effect between the United States and Colombia."  No. 3:18-mj-765-BN, 2019 WL

16  6118377 at *(N.D. Tex. Nov. 18, 2019).  In In re Extradition of Camelo-Grillo, this

17  Court certified the extraditability of a fugitive to Colombia after holding "[t]he State

18  Department's determination of the continuing validity of a treaty is entitled to

19  deference."  2017 WL 2945715, at *5.  Similarly, in Pardo Hasche, the district court

20  "gave great deference to the pronouncements of [the] executive branch as the Court is

21  required to do in this area," and held that "the Extradition Treaty [between the United

22  States and Colombia was] in full force and effect."  Pardo Hasche at 8.

23          Significantly, Perilla Umbarila has not cited, nor has the Court identified, any

24  decision in which a court has declared a treaty not in force when the State

25  Department says otherwise. Tr. 7:22-8:1.  In fact, notwithstanding his reliance on

26  Eleventh Circuit cases decided before Arias-Leiva,[7] Perilla Umbarila concedes that the

27  _____

28  [7]    Perilla Umbarila's reliance on these cases is misplaced because they involved
       fugitives who were extradited from Colombia pursuant to a request from the United

1    case law has established deference should be given to the State Department.  Tr. 8:7-

2    9.  Therefore, the political question doctrine and the view of the State Department is

3    sufficient to end the Court's inquiry.

4         This Court further notes Colombia concurs with the United States' position

5    that the Treaty is in full force and effect.  Specifically, Colombia has provided its

6    official position that the Treaty is in force in a diplomatic note from its Ministry of

7    Foreign Affairs, Colombia's counterpart to the State Department.[8]  See Suppl.

8    Heinemann Decl., ¶ 8 n.5.  Consistent with this view, Colombia routinely extradites

9    more fugitives to the United States per year than any of its other extraditing partners.

10   See id., ¶ 9.

11

12
     _____

13   States rather than the reciprocal context.  See Valencia-Trujillo, 573 F.3d at 1177-82
     (defendant arrested in Colombia and extradited to United States pursuant to
     Colombian domestic law, not extradition treaty); Duarte-Acero, 296 F.3d at 1279
14   (defendant arrested in Ecuador and extradited to United States); Gallo Chamorro, 233
     F.3d at 1301 (defendant arrested in Colombia and extradited to United States
15   pursuant to Colombian domestic law, not extradition treaty); United States v. Benitez,
     28 F. Supp. 2d 1361, 1363 (S.D. Fla. 1998) (defendants returned to United States from
16   countries other than Colombia and "presence in the United States is not pursuant to
     any extradition treaty between the United States and Colombia"); United States v.
17   Abbell, 963 F. Supp. 1178, 1189 n.22 (S.D. Fla. 1997) (footnote observing that
     Colombia did not extradite defendant's criminal associate to United States).
18   Moreover, "[t]he existence or validity of the Extradition Treaty was not the central
     issue in those cases and the bare dicta in those opinions does not reflect a thorough
19   analysis of the validity of the treaty or the ability to utilize it to extradite an individual
     to Colombia."  See Pardo Hasche, at 8; Legal Servs. Corp. v. Velazquez, 531 U.S. 533,
20   557 (2001) ("Judicial decisions do not stand as binding 'precedent' for points that
     were not raised, not argued, and hence not analyzed." (Scalia, J., dissenting))
21   (collecting cases).

22   [8]      Perilla Umbarila's claim that the Treaty is not in force based on the opinions of
     two former Colombian presidents, is not relevant.  Neither former official speaks on
23   behalf of the Colombian government.  Nor do these individuals speak on behalf of
     the United States and its interpretation of the impact (or lack thereof) of the
     Colombian Supreme Court's decisions on the validity of the Treaty.
24
          Likewise, the supplemental authority Perilla Umbarila introduced at the
25   extradition hearing, which states "Colombia and the United States have not had a
     mutually recognized extradition treaty since 1986," dkt. 46, does not alter the Court's
26   conclusion.  Notably, this 2005 State Department cable does not alter the fact that (1)
     Colombia ratified the Treaty through the passage of domestic legislation; (2) the
27   Treaty entered into force upon the exchange of instruments of ratification; (3) the
     Treaty continues to be in force, as neither party has given notice of an intent to
28   terminate it; and (4) the request to extradite Perilla Umbarila was submitted with the
     understanding that the United States would process it pursuant to the Treaty.

Additionally, contrary to Perilla Umbarila's claim, the fact that Colombia has denied some of the United States' extradition requests does not mean that the Treaty is invalid and not in force.  The plain language of the Treaty imposes obligations and benefits on both the United States and Colombia.  See, e.g., Treaty, arts. 1(1), 4(3), 17. Whether one party always complies with its obligations does not extinguish them. See, e.g., Charlton, 229 U.S. at 476 (noting "extradition treaties need not be reciprocal, even in the matter of the surrendering of citizens," in upholding State Department's decision to extradite U.S. national to Italy, even though Italy had refused to extradite Italian nationals to United States, contrary to applicable treaty terms requiring extradition of all "persons" charged with or convicted of extraditable offense).  Thus, even if Colombia denied extradition requests for reasons impermissible under the Treaty, such action would not invalidate the Treaty.[9]  Further, even if the United States' extradition relationship with Colombia were one-sided, that concern would be for the State Department, rather than the judiciary, to consider.[10]  Notably, at the extradition hearing, Perilla Umbarila admitted the relationship is not exclusively one-way, because Colombia has extradited individuals to the United States.  Tr. 7:1-4.

Accordingly, this Court holds Treaty between the United States and Colombia is valid and in force, and thus, the United States has satisfied this requirement for extradition.

---

[9]  As the United States noted, some of its strongest treaty partners occasionally deny extradition.  See, e.g., Nate Raymond, Ex-Swiss Banker Goes Home After U.S. Loses Extradition from Germany, Reuters News, Dec. 9, 2016, 12:06 PM; Matthew Day, Poland Refuses to Extradite Polanski to US, Daily Telegraph, Dec. 7, 2016, at 15; Gary McKinnon Extradition to US Blocked by Theresa May, BBC News, Oct. 16, 2012.

[10]  See Peroff v. Hylton, 563 F.2d 1099, 1102 (4th Cir. 1977) ("Even if the claimed lack of reciprocity [by Sweden for failing to extradite its citizens to the United States] were construed to be a violation of treaty obligations, it would be for the Executive alone to determine whether to waive such violations or to renounce the extradition agreement."); Polo v. Horgan, 828 F. Supp. 961, 967 (S.D. Fla. 1993) (rejecting a fugitive's request "to consider the results of extraditing an individual to a country that allegedly fails to reciprocate extraditing those individuals sought by the United States in conjunction with the allegations of misconduct by the Swiss Magistrate," finding that "these concerns cannot influence the Court's decision. They are more properly directed to the executive branch, specifically to the State Department.").

**E.      THE EXTRADITION REQUEST ESTABLISHES PROBABLE CAUSE THAT PERILLA UMBARILA COMMITTED THE CHARGED OFFENSES**

To certify Perilla Umbarila as extraditable, the Court must determine that there is probable cause to believe that the crimes charged by Colombia were committed and the person before the Court committed them.[11]  See Hoxha v. Levi, 465 F.3d 554, 561 (3d Cir. 2006).  Evidence is sufficient and probable cause is established if "there was any evidence warranting the finding that there was a reasonable ground to believe the accused guilty."  Mirchandani v. United States, 836 F.2d 1223, 1226 (9th Cir. 1988). The Supreme Court stated in Benson v. McMahon:

> [T]he proceeding before the commissioner is not to be regarded as in the nature of a final trial by which the prisoner could be convicted or acquitted of the crime charged against him, but rather of the character of those preliminary examinations which take place every day in this country before an examining or committing magistrate for the purpose of determining whether a case is made out which will justify the holding of the accused, either by imprisonment or under bail, to ultimately answer to an indictment, or other proceeding, in which he shall be finally tried upon the charge made against him.

127 U.S. 457, 463 (1888); see also Collins v. Loisel, 259 U.S. 309, 316 (1922) ("The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction."); Fernandez v. Phillips, 268 U.S. 311, 312 (1925) ("Competent evidence to establish reasonable grounds is not necessarily

---

[11]      In this case, there is no dispute that the person appearing before the Court is the same "Hector Manuel Parilla Umbarila" wanted by the Government of Colombia in its extradition request.

1    evidence competent to convict."); Barapind v. Enomoto, 400 F.3d 744, 752 (9th Cir.

2    2005) (en banc).

3         Where the person sought already has been convicted, the conviction is

4    dispositive of the issue of probable cause.  See Sidali, 107 F.3d at 196 ("[A] foreign

5    conviction obtained after a trial at which the accused is present is sufficient to support

6    a finding of probable cause for the purposes of extradition."); Spatola v. United

7    States, 925 F.2d 615, 618 (2d Cir. 1991) (agreeing with the district court's

8    determination that "where there has been a judgment of conviction [entered by a

9    foreign court], there is no need for an 'independent' determination of probable cause:

10   the relator's guilt is an adjudicated fact which a fortiori establishes probable cause."

11   (internal quotation marks omitted)); In re Extradition of Hughes, No. 12-1831-JGB

12   (MLG), 2013 WL 1124294, at *6 (C.D. Cal. Mar. 18, 2013) ("Where, as here, the

13   fugitive has already been convicted, the conviction is dispositive of the issue of

14   probable cause.").

15        The Ninth Circuit has not definitively resolved whether the fact of conviction,

16   by itself, is sufficient to establish probable cause if it was obtained in absentia.[12]  At a

17   minimum, however, a probable cause determination can be based on an in absentia

18   judgment of conviction where such judgment provides "a summary of the facts and

19   relevant evidence."  Haxhiaj v. Hackman, 528 F.3d 282, 289 (4th Cir. 2008).  For

20   example, in Haxhiaj, the Fourth Circuit upheld a probable cause determination based

21   on evidence summarized in an Italian appellate court opinion that affirmed the

---

[12]      In Haxhiaj, the Fourth Circuit noted "the international comity justification for
the general rule that foreign convictions constitute probable cause under § 3184"
could arguably extend to in absentia foreign convictions, see 528 F.3d at 291 n.2, and
other courts have found that an in absentia conviction supports a probable cause
finding. See, e.g., United States v. Bogue, Case No. CRIM.A. 98–572–M, 1998 WL
966070, at *2 (E.D. Pa. Oct. 13, 1998); United States v. Avdic, No. CR. 07–M06, 2007
WL 1875778, at *8 (D.S.D. June 28, 2007); Esposito v. I.N.S., 936 F.2d 911, 914 (7th
Cir. 1991) ("at the very least, in absentia convictions properly constitute probable
cause to believe that the petitioner is guilty of the crimes in question"); but see, e.g.,
Gallina v. Fraser, 278 F.2d 77, 78 (2d Cir. 1960) ("the federal court will treat a foreign
conviction in absentia merely as a criminal charge").

1  fugitive's <u>in absentia</u> conviction.  <u>Id.</u> at 287-92.  The Fourth Circuit further noted "the

2  magistrate judge has a great amount of latitude in considering evidentiary support for

3  an extradition request[.]"  <u>Id.</u>

4       <u>Haxhiaj</u> has been widely followed.  <u>See, e.g.,</u> <u>In re Extradition of Camelo-</u>

5  <u>Grillo</u>, No. 16-cv-9026, 2017 WL 2945715, at *8 (C.D. Cal. July 10, 2017) ("The

6  Court adopts the approach taken by the Fourth Circuit in <u>Haxhiaj</u> and other courts, in

7  which an <u>in absentia</u> conviction, supported by the court's summary of the evidence

8  presented, may provide probable cause."); <u>In re Extradition of Blasko</u>, No. 1:17-mc-

9  00067, 2018 WL 6044921, at *7-9 (E.D. Cal. Nov. 19, 2018) (relying on Slovakian <u>in</u>

10  <u>absentia</u> judgment of conviction); <u>In re Extradition of Risner</u>, No. 3:18-mj-765, 2019

11  WL 6118377, at *19 (N.D. Tex. Nov. 18, 2019) (relying on Colombian <u>in absentia</u>

12  judgment of conviction); <u>In re Extradition of Manea</u>, No. 15-mj-157, 2018 WL

13  1110252, at *24-25 (D. Conn. Mar. 1, 2018) (relying on Romanian <u>in absentia</u>

14  judgment of conviction); <u>In re Extradition of Bilanovic</u>, No. 1:08-mj-74, 2008 WL

15  5111846, at *10-13 (W.D. Mich. Dec. 3, 2008) (relying on Bosnia and Herzegovina

16  court decision to convict fugitive <u>in absentia</u>).

17       Here, Perilla Umbarila was tried, convicted, and sentenced for the crimes of

18  Aggravated Homicide, Homicide, and Robbery with Violence in Colombia.  <u>See</u> dkt.

19  19-5 at 48-49.  The Superior Tribunal's judgment of conviction was based on the

20  record developed at trial,[13] and therefore, the fact that Perilla Umbarila did not

21  participate in the appellate proceedings does not alter the analysis.  <u>See, e.g.,</u> <u>Hughes</u>,

22  2013 WL 1124294, at *2 (granting Mexico's request for extradition where the acquittal

23  at trial court level was reversed by Mexican appellate court but the fugitive fled during

24  pendency of the proceedings).  Notably, Colombia has stated Perilla Umbarila was

25  aware of the appellate proceedings but did not attend contrary to his obligations.  <u>See</u>

26  dkt. 19-5 at 7.

27  _____

28  [13]     The trial court record further establishes Perilla Umbarila testified on his own
behalf.  <u>See</u> dkt. 19-3 at 42.

Moreover, even if this Court were to apply the in absentia line of cases, probable cause has been established here.

This Court relies on the Superior Tribunal's judgment as sufficient evidence that Perilla Umbarila committed the crimes for which his extradition is sought.  Thus, the Court holds that this judgment alone supports a finding of probable cause.[14]  The Court further holds that "an independent assessment of the facts surrounding [the] offenses" supports a finding of probable cause.[15]  Haxhiaj, 528 F.3d at 290.

The Colombian record reveals that eyewitnesses saw Perilla Umbarila at Umbarila-Bernal's residence prior to the murder.  A neighbor reported hearing shouts and voices coming from the floor where Umbarila-Bernal's apartment was located near the time that the victims were murdered.  Umbarila-Bernal's daughters provided a motive for Perilla Umbarila to kill their mother, noting that she had refused to give him money, that he reacted aggressively towards her, and that she decided to change the locks to prevent Perilla Umbarila from entering her apartment uninvited.

The crime scene revealed no sign of forced entry.  Umbarila-Bernal had been hit on the head and stabbed in the neck and a sock had been put in her mouth to keep her from screaming.  Martinez-Mendez had been stabbed nine times in the neck, back and upper extremities.  He had defense wounds on his hands and forearms.  Umbarila-Bernal's bedroom, where she was killed, was in disarray.  Police discovered

---

[14]    The fact that the trial court acquitted Perilla Umbarila is not relevant because the Colombian trial court did not make a finding on the issue of probable cause.  Tr. 9:2-5.  Rather, the trial court based its decision on proof "beyond any doubt."  Dkt. 19-3 at 50; Tr. 9:6-13.  In other words, while the trial court found that the prosecution had not met the higher threshold of proof beyond any doubt, that court did not analyze its decision based on the lower probable cause standard applicable here.

[15]    The Court recognizes "[f]oreign states requesting extradition are not required to litigate their criminal cases in American courts," Santos, 830 F.3d at 991, and "[i]t is fundamental that the person whose extradition is sought is not entitled to a full trial at the magistrate's probable cause hearing," Eain v. Wilkes, 641 F.2d 504, 508 (7th Cir. 1981); see also Collins, 259 U.S. at 316 ("The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction."); Fernandez, 268 U.S. at 312 ("Competent evidence to establish reasonable grounds is not necessarily evidence competent to convict.").

1  a smashed piggybank, emptied jewelry boxes, and an open wallet (or handbag), and a

2  drawer and nightstand that appeared to have been rifled through.

3          Perilla Umbarila's girlfriend noticed he was wearing different clothes when he

4  returned to their apartment and that he was carrying a blue suitcase.  Although Perilla

5  Umbarila told her that he changed clothes at his aunt's apartment, the police were

6  unable to locate the clothing.  The blue suitcase contained creams and sprays, a

7  mobile telephone, and women's jewelry.  Perilla Umbarila's girlfriend also found "100

8  COP500" coins.  Perilla Umbarila's explanation of why he had these items was

9  contradicted by one of Umbarila-Bernal's daughters.

10          Based upon these facts, the Court finds probable cause to believe Perilla

11  Umbarila committed the offenses for which his extradition is sought.

12                                          **III.**

13                                    **<u>CONCLUSION</u>**

14          For the foregoing reasons, the Court finds that the Treaty between the United

15  States and Colombia is valid and in force.  The Court further finds that Colombia's

16  extradition request contains sufficient evidence of probable cause on each of the

17  criminal charges for which Colombia seeks Perilla Umbarila's extradition.  Having

18  found all of the requirements for certification of extradition have been satisfied, the

19  Court certifies the extradition of Perilla Umbarila to the Secretary of State and

20  commits him to custody pursuant to 18 U.S.C. § 3184 and in accordance with the

21  following order.

22          **THEREFORE,** pursuant to 18 U.S.C. § 3184 and the above findings and

23  legal conclusion, **THE COURT HEREBY CERTIFIES** the extradition of

24  HECTOR MANUEL PERILLA UMBARILA to the Republic of Colombia, on the

25  above offenses for which extradition was requested.

26          **IT IS FURTHER ORDERED** that HECTOR MANUEL PERILLA

27  UMBARILA remain committed to the custody of the United States Marshal pending

28

final decision on extradition and surrender by the Secretary of State pursuant to 18 U.S.C. §§ 3184, 3186.

**IT IS FURTHER ORDERED** that the Clerk of the Court forthwith deliver to the Assistant U.S. Attorney a certified copy of this Findings of Fact and Conclusions of Law; Order Certifying Extraditability and forward without delay certified copies of the same to the Secretary of State (to the attention of the Office of the Legal Adviser) and the Director, Office of International Affairs, Criminal Division, U.S. Department of Justice, Washington D.C., for appropriate disposition.

Dated:  January 13, 2022

_____
HONORABLE KENLY KIYA KATO
United States Magistrate Judge